291 P.2d 607

**Rudolph SCHWARE, Petitioner,**

v.

**BOARD OF BAR EXAMINERS OF the State of NEW MEXICO.**

No. 5847.

Supreme Court of New Mexico.

Sept. 7, 1955.

Dissenting Opinion Sept. 30, 1955.

Rehearing Denied Dec. 19, 1955.

P. H. Dunleavy, Key & Brown, Edward G. Parham, Albuquerque, for petitioner.

Richard H. Robinson, Atty. Gen., Fred M. Standley, Asst. Atty. Gen., William A. Sloan, Albuquerque, for respondent.

McGHEE, Justice.

This matter is before us on a pleading we treat as a petition to review the action of the State Board of Bar Examiners in denying the application of Rudolph Schware to take the examination for admission to practice law in this state.

In December, 1953, the petitioner applied for leave to take the bar examination in February, 1954. He was advised by letter that he would be entitled to do so. When he presented himself for examination he was interviewed by the Board of Bar Examiners. No transcript was made of this interview, but at its close the following action was taken by the board:

> "No. 1309, Rudolph Schware. It is moved by Board Member Frank Andrews that the application of Rudolph Schware to take the bar examination be denied for the reason that, taking into consideration the use of aliases by the applicant, his former connection with subversive organizations, and his record of arrests, he has failed to satisfy the Board as to the requisite moral character for admission to the Bar of New Mexico. Whereupon said motion is duly seconded by Board Member Ross L. Malone, and unanimously passed."

A second hearing was held before the board on July 16, 1954, and transcript made thereof. At the conclusion of this hearing the board was of the unanimous opinion the former determination should stand.

It is agreed by all that this court has plenary jurisdiction to review the decision of the board. In re Gibson, 1931, 35 N.M. 550, 4 P.2d 643; In re Royall, 1928, 33 N.M. 386, 268 P. 570. In such review this court is not limited by appellate rules, but the matter is considered originally.

The substance of petitioner's argument is made under two points, the first of which is: The right to practice law is a property right protected by the Fifth and Fourteenth Amendments of the Constitution of the United States. Under this point reference is made to the cases of Ex parte Garland, 1866, 4 Wall. 333, 71 U.S. 333, 18 L.Ed. 366, and Cummings v. The State of Missouri, 1866, 4 Wall. 277, 71 U.S. 277, 18 L.Ed. 356. In the latter case it is said:

> "* * * We do not agree with the counsel of Missouri that 'to punish one is to deprive him of life, liberty, or property, and that to take from him anything less than these is no punish-

ment at all.' The learned counsel does not use these terms—life, liberty, and property—as comprehending every right known to the law. He does not include under liberty freedom from outrage on the feelings as well as restraints on the person. He does not include under property those estates which one may acquire in professions, though they are often the source of the highest emoluments and honors. The deprivation of any rights, civil or political, previously enjoyed, may be punishment, the circumstances attending and the causes of the deprivation determining this fact. * * *"

It is not necessary to class membership in the legal profession with ownership of real estate or other tangible article in order to recognize an individual has a right therein. We regard as inutile an attempt to categorize it at all. But, granting that such membership is a species of property, as that word is employed in the Constitution, it does not follow, and we do not take it as contended by petitioner, that the right to its enjoyment is absolute and unfettered by any mode of regulation.

In an annotation in 98 L.Ed. 851, at p. 852, substantive due process in its application to the type of property with which we are here concerned is described in the following language:

"Substantive due process of law may be roughly defined as the constitutional guaranty that no person will be deprived of his life, liberty, or property for arbitrary reasons. Such a deprivation is constitutionally supportable only if the conduct from which the deprivation flows is proscribed by reasonable legislation (that is, legislation the enactment of which is within the scope of legislative authority), reasonably applied (that is, applied for a purpose consonant with the purpose of the legislation itself)."

The board acted under Rule III of the Rules Governing Admission to the Bar of New Mexico, which provides "that the Board of Bar Examiners may decline to permit any such applicant to take the (bar) examination when not satisfied of his good moral character." We do not see how this requirement, which in the same or similar language is universal in this country so far as we know, Annotation 72 A.L.R. 929, can seriously be challenged as unreasonable.

Judge Cardozo has this to say of the requirement of good moral character upon admission to the bar, and afterward:

"Membership in the bar is a privilege burdened with conditions. A fair private and professional character is one of them. Compliance with that condition is essential at the moment of

admission; but it is equally essential afterwards. (Citing cases.) Whenever the condition is broken the privilege is lost. To refuse admission to an unworthy applicant is not to punish him for past offenses. The examination into character, like the examination into learning, is merely a test of fitness. * * *" In re Rouss, 1917, 221 N.Y. 81, 116 N.E. 782, 783.

The cases are numerous, too, which hold that by asking admission into the legal profession an applicant places his good moral character directly in issue and bears the burden of proof as to that issue. Spears v. State Bar, 1930, 211 Cal. 183, 294 P. 697, 72 A.L.R. 923; In re Wells, 1917, 174 Cal. 467, 163 P. 657; Rosencranz v. Tidrington, 1923, 193 Ind. 472, 141 N.E. 58, 28 A.L.R. 1136; In re Weinstein, 1935, 150 Or. 1, 42 P.2d 744.

Thus we are brought up to the controverted, substantial question before us of whether the petitioner has produced proof of his good moral character so as to entitle him to take the examination for membership in the bar of this state, as contended by him under his second point.

An examination of this sort is concerned ultimately with the subjective character of the individual. Character cannot be laid upon a table, so we must resort to two kinds of indirect evidence: First, the pattern of conduct an individual follows, and, second, a consideration of the regard his fellows and associates have for him. This investigatory technique can, at best, but dimly throw into relief the architecture of character; still, it is all we have. In this particular inquiry the technique leads us through petitioner's own disclosures to behavior which cannot be severed from a social ideology which now stands athwart so much of the Eastern World dividing men from men—Communism.

The legal status of the Communist Party in the United States is far different today from that which obtained during the years of the Depression and following, when petitioner was a member of it. He calls our attention to the fact that as late as 1948 the Communist Party was a recognized political party and had candidates for the Presidency of the United States every four years up to and including 1948. We do not overlook the fact that during the years petitioner was a member of the Young Communist League and the Communist Party, from 1932 to 1940, such membership was not unlawful. But that fact does not restrain us from examining his former associations and actions, including his arrests and his use of aliases, and his present attitude toward those matters, as contained in his statements to the board, in order to arrive at a conclusion as to his character. As said in American Communications Ass'n v. Douds, 1950, 339 U.S.

382, 411, 70 S.Ct. 674, 690, 94 L.Ed. 925, "the state of a man's mind must be inferred from the things he says or does."

It is generally held that an inquiry into character preceding admission to the bar is different from the inquiry had upon proceedings to disbar. This is already exemplified in part by our earlier reference to the rule that an applicant bears the burden of proof of good character. It is also to be noted in the scope of inquiry. It is said in In re Wells, supra [174 Cal. 467, 163 P. 661]:

"* * * In a proceeding to disbar an attorney the burden is on the accuser to prove moral turpitude. The requirement on his admission is to prevent the accrediting of untrustworthy persons as fit to receive the confidence attending upon the relation of attorney and client. The inquiry may extend to his general character as well as to particular acts. It is broader in its scope than that in a disbarment proceeding. The court may receive any evidence which tends to show his character for honesty, integrity, and general morality, and may no doubt refuse admission upon proofs that might not establish his guilt of any of the acts declared to be causes for disbarment."

Similarly, in In re Farmer, 1926, 191 N. C. 235, 131 S.E. 661, 663, we find this statement:

"This 'upright character,' prescribed by the statute, as a condition precedent to the applicant's right to receive license to practice law in North Carolina, and of which he must, in addition to other requisites, satisfy the court, includes all the elements necessary to make up such a character. It is something more than an absence of bad character. It is the good name which the applicant has acquired, or should have acquired, through association with his fellows. It means that he must have conducted himself as a man of upright character ordinarily would, should, or does. Such character expresses itself, not in negatives nor in following the line of least resistance, but quite often in the will to do the unpleasant thing if it is right, and the resolve not to do the pleasant thing if it is wrong. * * *"

Before proceeding to examine the record as to the matters assigned by the board for its refusal to endorse the petitioner, "the use of aliases by the applicant, his former connection with subversive organizations, and his record of arrests", it should be stated that only one member of this court has looked at the contents of what might be termed the "confidential file", which contains answers to inquiries which the bar examiners cause to be mailed out regarding applicants who have not theretofore practiced law, the answers being returned to the clerk of this court, who is also the secretary

of the Board of Bar Examiners. That member is the Honorable H. A. Kiker. In making this statement the writer and the remainder of the court do not intend that any reflection should be cast upon that justice in his examination of materials not made available to the petitioner. The statement is made for the sole purpose of advising petitioner that, regardless of whether this court has power to examine and rely upon "confidential" information about an applicant for admission to the bar, on which question we make no pronouncement, its members, with the single exception noted, have chosen not to do so. Also, at the oral argument here, and in its response and brief, the board disclaims having based its decision upon such information.

As the facts before us are the history of a man, they are best stated in narrative form.

The petitioner was born in New York in 1914. His father was a needles trade worker, an immigrant, a poor man and a socialist. Petitioner began work at the age of nine and continued part-time work during his school years. He attended DeWitt Clinton High School in the Bronx, New York, from 1928 to 1932. In 1932, at the age of eighteen, he joined the Young Communist League. This association arose out of the following circumstances, as described by petitioner:

"Well, I was going to High School and a fellow I was playing handball with during school hours when we used to get an hour off told me that he had written a letter to the school newspaper dealing with the question of unemployment in the United States, that the editors of the school paper wanted to publish it but that the faculty adviser refused to allow it to be published and he said that there was a club on the campus which dealt with problems such as that and asked me to attend one of the meetings. Well, I attended one of the meetings of the club and I found out that what he'd told me was true. I thought that freedom of the press was important, I was approximately eighteen years old at the time, and I attended meetings of the club whenever I could, which wasn't too often. The club ran candidates in the school elections. This was just prior to my graduation and they had a —— the platform called for lower prices in the school lunch room and stuff like that and our candidates won the election.

"It was after the election that the principal called all the members of the club into his office and our faculty adviser and told us that because of the way that the campaign had been conducted that we would have to disband the club. Now I know that right after we won the election they lowered the price of a glass of milk in the school

lunch rooms from five cents to three cents and other foods correspondingly.

"There were a number of people who belonged to the club who belonged to various political organizations, the main ones were the Young Peoples Socialist League, that had about approximately eight or nine members and there were four who belonged to the Young Communist League. To my dying day I will never forget, we were in the principal's office and the principal says, you either —you have to disband the club or else stand suspended. And the leader of the Young Peoples Socialist League got up and he said, 'Seeing as how you put it that way, I acquess.' I never knew what that word meant until I looked it up. He meant to say, 'I acquiesce.'

"There were five people who refused to disband. Four of them were members of the Young Communist League, and myself. I thought it was wrong for the club to have to disband and it set me to thinking—I'd been raised in the socialist atmosphere—why was it when a test came, you've got to realize I was eighteen years at the time—when the test came why was it that the socialists had backed down and the Communists had stood up and I thought and thought and finally my—over the objections of my family—an invitation was given to me to join the Young Communist

League and I joined the Young Communist League. It was a few years later that I joined the Communist party."

In connection with the refusal to disband the club, petitioner was suspended from school for about three days.

Petitioner joined the Communist Party in 1934 at the age of twenty.

In 1933 petitioner was employed in a pocketbook factory in Gloversville, New York. For the first time he used an alias. In his written application to take the bar examination he stated with regard to the alias:

"I wanted to organize the employees into a union. Because a large number of employees were Italian, I was of the opinion that union organization work would be facilitated if I adopted an alias. I used the alias Rudolph de Caprio while employed at this factory. When the workers were organized into a Local Union affiliated with the American Federation of Labor, I left for my home in New York City and resumed use of my real name."

At the July, 1954, hearing, the petitioner said of the use of this alias:

"A. Well, I worked in Monticello, New York, in a hotel driving as their chauffeur and then when the work slacked—when the hotel closed down

for the summer season, on the way into New York there is a town called Gloversville and had a large Italian population and practically all the people working in the factory there were Italians and in order to get a job to earn a living I changed my name from a Jewish to an Italian name and kept the same first name and was able to get a job.

\*    \*    \*    \*    \*

"Q. Was that the first time that you ever used an alias?

"A. Yes.

"Q. Was the sole purpose for that to gain employment?

"A. Yes."

From February, 1934, to February, 1937, petitioner lived in Los Angeles, San Pedro, San Francisco and Berkeley, California, where he was employed in shipyard work, as a longshoreman and warehouseman, and part of the time as a seaman. During this period he used the alias Rudolph de Caprio.

During the maritime strike in 1934 petitioner was arrested a number of times and was booked under the alias of Joe Fliari, or Fliori.

Of his use of the alias, Rudolph de Caprio in California, petitioner testified at the hearing before the board:

"Q. Why did you use the name in the shipyard? A. The same reason, I don't know of any and I never did find any Jewish person who is working in the shipyard.

"Q. Was the use of the name solely to obtain employment? A. Yes.

"Q. Was there any intention to deceive anyone? A. No."

When it was called to petitioner's attention that he had explained the original use of an alias on the basis that he would be more effective as a labor organizer in organizing workers of Italian extraction, and that at the hearing he explained the use of aliases as solely for the purpose of obtaining employment, he testified he used the aliases for both reasons.

On his use of the alias Joe Fliari, or Joe Fliori, upon his arrests, and of the circumstances of the arrests, petitioner testified:

"Q. Did you ever on any other occasion use an alias? A. Yes, a number of times, I believe it was two. I have tried to check with the Los Angeles Police Department and made a trip to California purposely to get the information, because the information was refused to be supplied to me by mail, to find out how many times I'd been arrested in San Pedro, California. I know definitely that I was arrested twice and this was in the course of a strike and while I was in San Pedro I went through the files of the San Pedro Newspaper and found

that there were approximately two to 3,000 people arrested in the course of about 66 days, approximately, over 200 on a charge of suspicion of criminal syndicalism. (Discussion off the record.)

"Q. You were speaking about the arrest of approximately two or 3,000 people during the strikes at San Pedro, California, were you arrested at that time? A. Yes, I—to the best—

"Q. First let's stay with the name, what name were you working under in the shipyard? A. Rudy DiCaprio.

"Q. And how many times were you arrested during the course of that strike? A. To the best of my knowledge and belief twice.

"Q. At that time it was— A. Criminal syndicalism.

"Q. Is that a state or federal? A. State.

"Q. What is criminal syndicalism, if you know? A. Well, there is a statute which defines criminal syndicalism as a person—as the commission of an act in which somebody attempts to overthrow or subvert the state government, essentially that is what it is.

"Q. Were you ever tried on this charge? A. No, I was never tried on the charge.

"Q. Were the charges dismissed? A. I assume so, I was never brought before a judge, I was kept in jail, I remember one time 72 hours and then released and the second time I remember I was in jail approximately five days and read in the paper on the 3rd day that I'd been released but that I was still in jail but I'd never been brought before a judge and was released.

"Q. And now sticking with the use of names, you have testified that you used the name of DiCaprio at Gloversville, New York, and at San Pedro, did you use any other alias at any time up until 1940? A. Well, as I said, when I was arrested I used the alias of Joe Fliori.

"Q. Was that in connection with employment or just a name that you assumed to give to the police? A. A Name that I assumed to give to the police, I suppose, it is a long time ago, I suppose I thought, well, if the company knew that I'd been arrested it was possible that I wouldn't be able to go back to work.

"Q. There was no question of your identity with the police since they had you in person? A. No, no.

"Q. They had you regardless of what your name was? A. That is correct.

"Q. And did you obtain any monetary benefit as a result of that name? A. None whatsoever."

In the Communist Party petitioner used either the name Rudy DeCaprio or Joe Fliori. He could not recall which one.

In February, 1937, petitioner's father died and he returned to New York. At this time he left the Communist Party. He described this break with the Party as follows:

"Q. You say you left the Communist party in 1940. Would you tell the Committee in your own words the reason why you left.

"A. Well, I'd left the Communist party once before in 1937, I believe, when my father died. I left California and went back home to New York. I dropped out of the Communist party then and that was the time when I assumed my rightful name and said to myself, why are you ashamed to be known as Rudolph Schware, the son of your father. * * *"

In the years between May of 1937 and January of 1943, petitioner worked for a short time in Chicago, then in Texas at a vegetable processing plant, then in Indianapolis picking corn. He was intermittently hitch-hiking and looking for work, and finally came to Detroit. He testified as to the time spent in Detroit as follows:

"* * * I was single at the time and the relief that the City of Detroit gave for single men was this place called Fisher Lodge, approximately 2,000, 3,000 people, and food was about as much as the city could afford at that time and I was instrumental in helping to organize an organization in this lodge so that we could get better food and perhaps able to get jobs as a result of that."

In Detroit he was again approached to rejoin the Communist Party, which he did. He states of this reaffiliation:

"* * * my disillusionment had been going on and then you had in 1939, I believe it was, you had your Stalin-Hitler pact which began to raise a lot of questions in my mind and then in 1940 I began to see. At that time I was the State Secretary of the Michigan Workers Alliance and I began to see that the Communist party wasn't interested so much, those beautiful words wasn't so much that but a struggle for power on the part of a few individuals that they wanted the power and they didn't care what happened to the other people. Of course, I was a lot older then, I was a lot older then, too, and I'd been questioning and questioning for quite some time and finally I made the events reach the stage where the party organization was trying to say how the organization of which I was the elected secretary should be run, not for the benefit of the

organization, that is when I reached the final decision, you and I part ways and I left."

Petitioner was arrested in Detroit in 1940 in connection with the Neutrality Act of 1816, when he was engaged in obtaining recruits to oppose Franco's forces in the Spanish Civil War. He had himself volunteered to go to Spain to fight, but was unsuccessful in getting passage there. He states of this arrest:

"Q. * * * I want to inquire whether or not you knew at that time that you were engaged in these recruiting activities that there was any question as to their legality?

"A. No, I had no knowledge whatever that I was violating a law. There was no knowledge whatsoever.

"Q. Was the recruiting being conducted openly or surreptitiously?

"A. Quite openly. Everybody knew I, myself, and the people in my organization and in the surroundings that I was traveling in at that time, everybody knew, for instance, that I, myself, had volunteered to go to Spain but I had no knowledge whatsoever that I was breaking any law. Of course, I had read history and known of during the American Revolution people coming over from Europe to help our fight here, before we became a nation."

The charges under which he was arrested in Detroit were terminated by nolle prosequi filed on behalf of the government.

From 1940 to 1943 the petitioner had scattered employment, working part of the time as a truck driver. He was arrested in 1940 or 1941 in a town in Texas, the name of which he could not recall, on a charge of "suspicion of transporting a stolen vehicle." He stated he was driving the car to California for a friend and after being held while the police presumably inquired into the ownership of the car and his right to possession of it, he was released.

In response to a question in petitioner's written application to take the bar examination asking that he state every residence he had had since he was sixteen years of age, and indicating the name of the city and state, the street address and the period of time by month and year of each separate residence were to be given, petitioner stated that he had had ten different residences during the period March, 1934 to January, 1943, the latter date being the time he was inducted into the United States Army. He lived in California, New York, Illinois, Texas, Michigan and Indiana. He could recall only two street addresses. One was the home of his family in New York where he spent three months in 1937; the other was an address in South Bend, Indiana, where he lived approximately two years.

Another question on petitioner's application form sought information as to all employments he had had since the age of sixteen years, specifically asking for the time periods of such employment, exact addresses of offices or places where employed and the names and present addresses of all former employers. From March, 1934, to November, 1935, petitioner was employed as a machinist's helper at Bethlehem Shipbuilding Company, Terminal Island, San Pedro, California. He could not recall the names of his superiors. He left there to join the merchant marine. He then spent five months as a seaman, first on a freighter. He could not recall the name of the ship, but believed he worked for the Calmar Line, making no statement as to the whereabouts of its offices. Then he left that employment to sail on a steam schooner plying the Pacific Coast. He made no statement as to the name of his employer, or otherwise identified the schooner. After that he worked ten months as a longshoreman on the docks in San Francisco, Oakland and Berkeley, California. Then, after a trip to New York at the time of his father's death he worked in a grocery store for some four months. He could not recall the name of the store or the owner. He worked two months in a vegetable processing plant in Rio Hondo, Texas. He could not recall the name of the plant or the owner.

The application states that from March, 1938 to June, 1940, he was in Detroit working with the Wayne County Workers Alliance and the Michigan Workers Alliance. The offices were located on Grand River Avenue. He gives no names of associates. Upon leaving this work he was unemployed for a while and then became regularly employed as a truck driver in South Bend, Indiana for about two and a half years. One company for which he worked went out of business when the 1942 car production was halted. He gives the name of the company, the owner and the office address of his last employer in South Bend, which corresponds with the period of time for which he had given a residence address as earlier noted. This brought him up to the time when he was inducted into the army.

The summation of all this is that for approximately nine years petitioner has provided only one residence address other than the home of his parents in New York. Over that period he has given only one personal name of an employer, for whom he also gave a completed street address in South Bend, Indiana, and only the street name for the location of the two Workers Alliances he was connected with in Detroit. This adds up to only slightly more than a complete blank. If it were not for the fact that petitioner had such a tenuous existence during those years, his inability to recall with more definiteness the location of his

residences and the names and locations of his employers would be entirely void of explanation.

Petitioner was drafted into the Army in January, 1944, and served until 1946, when he was honorably discharged. He lived in South Bend, Indiana from 1946 to 1950, during which time he was self-employed in the sale of venetian blinds and also attended Western Michigan College.

In 1950 he enrolled in the Law School of the University of New Mexico. He discussed with the dean of that school his former affiliation with the Communist Party. When questioned by one of the bar examiners at the hearing as to whether it had ever occurred to him that his experience and membership in the Communist Party and his activities in that organization would affect him in his ability to be admitted to the bar, he stated:

"A. Well, I'd classify that under the heading of a calculated risk. In other words, we knew that there was a possibility that I would not be permitted to take the exam. On the other hand, we also knew that these are things that took place when I was a young person * * * I was expecting that you gentlemen will say that we have to hold a hearing on your case, Mr. Schware. Frankly that is what I expected."

Petitioner married in 1944. He has two children. Nine letters which he wrote to his wife while in the armed services in 1944 were offered by him in evidence as corroborative of his claim to be converted from Communism and to be of good moral character. The Rabbi of a synagogue in Albuquerque testified the petitioner was a member of his congregation in good standing, that his children received religious training.

While in law school petitioner established an anonymous scholarship of $50 a year to be given to needy law students, which he has continued and hopes to continue indefinitely.

Some seventeen letters from law professors and students and business associates were introduced into the record stating that petitioner is a person of good moral character, these letters being from persons who have known the petitioner in New Mexico.

Burdensome though it be to the reader, there is still more of the record of petitioner's hearing before the board which must be covered. He testified, on questions by the board members, regarding his knowledge of Communist aims and methods. This testimony is somewhat extensive and we quote only part of it:

"Q. * * * Is it true or is it not true that a bona fide member of the Communist party recognizes only the Communistic authority as the author-

ity to which he owes all allegiance, is that correct? A. That is correct.

"Q. As a Communist, in other words, a Communist who may be an American citizen, but if he joins the Communist party, his loyalty and allegiance are to the heads of the Communist party in Russia, is that correct? A. Well, I know when I was a member of the Communist party while we looked to Russia as the guiding star, still we considered ourselves American citizens and as a legal political party. Does that answer your question?

"Q. Not entirely. Let's say that I belonged to the Communist party and a directive of whatever nature it may be comes from Russia or at least where I understand is the source of words of wisdom and a certain directive comes out to a true member of the Communist party— A. That is all.

"Q. —am I under obligation, if I am a Communist, to obey that directive? A. That is law and that is probably one of the reasons why the Communist party has been so much repudiated by the American people. We've got, just like myself, there have been hundreds of thousands of people who entered the Communist party's ranks and finally end up asking ourselves questions and starting to ques-

tion why, why, and then saying to heck with you.

"Q. Well, to get back to this thought that the basic concept of the Communist party is that they—it recognizes no nationalistic lines, that is, if you belong to the Communist party in the United States you are the same breed of cats as one who belonged to the Communist party in Argentina or whatever that may be? A. That is correct.

"Q. And the belief is that the Communist party as such should be the controlling factor in government, is that right? A. That is the aim eventually.

"Q. All right now, let's say that I am a member of the Communist Party and I am residing in the United States and you are a member of the Communist party and you are residing in Mexico. Say that a war should break out in which Russia, China, whatever countries might make the alignment, would be on the one side and the United States and other countries, including Mexico, would be opposed, and the directive would come out of Russia to me here and one to you down there to do whatever we could to aid the cause of Communistic forces that were at war with, what they would classify if Russia— A. I have no doubt they would.

"Q. —would issue that directive, if I am a true Communist and that directive would be to blow up the railroad track or something I would be advised to do it, it would be my duty?
A. I said I have no doubt.

"Q. All right, if I am a Communist I follow that directive, is that correct?
A. Yes."

Throughout the record of this hearing petitioner asserts that he left the Communist Party because he was disillusioned with its leaders and further that he came to the realization that it was the individual that counted, rather than the all-powerful state advocated by Communism.

There is to us a lack of credibility in petitioner's testimony as to the extent of his disillusionment with the leaders and the philosophy of Communism, for we find in one of the letters to his wife written in 1944, four years after his break with the Party, which his attorney offered in evidence along with others to show what was in petitioner's heart during the year they were written, these assertions:

" * * * The FEPC (Fair Employment Practices Commission) is one of the most important of Roosevelt's win the war agencies. It has helped to break down the reactionary barrier, that relegated Negroes to the unskilled, most dirty jobs at the lowest wages, in order to allow them to contribute their labor to increasing production for victory. Thousands of them now perform skilled labor in many industries that they never had a chance of entering before Roosevelt established the FEPC.

"White supremacy is a tool of the Southern bourbons to continue in power at the expense of the welfare of the South itself and the nation as a whole. It is on a. par with Hitler's attempt to delude the German people into believing that they are Aryan supermen.

"You yourself know intimately of the evil: Anti-Semitism. You know that the Jewish people throughout the ages have made important contributions to the cause of progress. Jim-Crow is on a par with Anti-Semitism, anti-Catholicism, *anti-Communism.* In a democracy one cannot discriminate against a minority. When one does, consciously or unconsciously they are playing Hitler's game, making use of his favorite tactic to divide us, certainly not contributing to National Unity which is so important not only for winning the war in the shortest period of time, but also for the winning of a just peace and making this world a better place to live in for all.

*"All the above anti's I mentioned are most dangerous and stupid mistakes for Americans to make.* They violate Christian ethics as well as all other ethical principles that recognize the

brotherhood of man. To top it all off, consider them immoral." (Emphasis supplied.)

We cannot believe that the foregoing letter is the letter of a man who four years previously had battled within himself and repudiated Communism as a quest for power by a few, as he declares to have done. No doubt the introduction of this letter by petitioner was inadvertent, but it tells us what was in his heart. He would still the voice of all who would criticize Communism.

There was certainly nothing inadvertent about petitioner's membership in the Communist Party from 1934 to 1940, when he was twenty to twenty-seven years of age. We agree with the Board of Bar Examiners that these are responsible years. During them his activities were largely connected with the labor movement in this country, as an organizer working out of the Communist Party. We have no reason on the record before us to credit him with a lack of knowledge of the purposes, aims and machinery of that Party in the United States.

The foundation of the Communist "theology" is laid bare in Justice Jackson's concurring opinion in American Communications Ass'n v. Douds, cited supra, beginning at page 422 of 339 U.S., at page 695 of 70 S.Ct., in the following numbered statements. We omit the exposition which in the opinion follows these statements, in the interest of brevity, but commend a full reading of the entire opinion for a clear and startling picture.

"1. The goal of the Communist Party is to seize powers of government by and for a minority rather than to acquire power through the vote of a free electorate. * * *

"2. The Communist Party alone among American parties past or present is dominated and controlled by a foreign government. * * *

"3. Violent and undemocratic means are the calculated and indispensable methods to attain the Communist Party's goal. * * *

"4. The Communist Party has sought to gain this leverage and hold on the American population by acquiring control of the labor movement. * * *

"5. Every member of the Communist Party is an agent to execute the Communist program. * * *" (Italics omitted.)

We believe one who has knowingly given his loyalties to such a program and belief for six to seven years during a period of responsible adulthood is a person of questionable character. We do not think it an exaggeration to say that many have doubtless been denied entry into or expelled from

membership in the legal profession for far less serious offenses against ethic.

We think, also, that the conclusion is warranted that petitioner has erased in his own conscience any culpability attaching to the use of aliases upon the bases he thought it necessary to hide his ancestry to secure employment. He does not today appear to us to bear the weight of this deception upon his employers and the police as a dishonesty, but simply as an excusable expedient. Furthermore, he excuses his arrests in California upon the ground that many others were arrested, too. With respect to the arrest in Detroit, for activity in violation of a federal statute, we take it that he regards his work in obtaining recruits for a foreign war as even commendable because he had concluded which side was right.

■ On the basis of these considerations we must approve the recommendation of the Board of Bar Examiners. This board is comprised of leaders of the legal profession in this state. One of its members is a former district judge, and another is at this time a member of the Board of Governors of the American Bar Association. They are responsible, experienced attorneys. They questioned the petitioner, heard him and observed his demeanor. At a time before the formal hearing before the board, the petitioner wrote a letter to the board asking that he be permitted to appear before this court, but, on May 21, 1954, this request was withdrawn as being premature and was never renewed.

We take no pleasure in the duty we have had to perform, for no man is all good or all bad. The record on which this decision is based came from the petitioner himself, who presently enjoys good repute among his teachers, his fellow students and associates and in his synagogue. But our obligation to the bar of this state knows no compromise. Petitioner has sought an office difficult to obtain and difficult to serve. The oath required of attorneys in New Mexico, based upon § 18-1-9, 1953 Comp., reads as follows:

"I will support the Constitution of the United States and the Constitution of the State of New Mexico;

"I will maintain the respect due to Courts of Justice and judicial officers;

"I will not counsel or maintain any suit or proceeding which shall appear to me to be unjust, nor any defense except such as I believe to be honestly debatable under the law of the land;

"I will employ for the purpose of maintaining the causes confided to me such means only as (are) consistent with truth and honor, and will never seek to mislead the judge or jury by any artifice or false statement of fact or law;

"I will maintain the confidence and preserve inviolate the secrets of my cli-

ent, and will accept no compensation in connection with his business except from him or with his knowledge and approval;

"I will abstain from all offensive personalty, and advance no fact prejudicial to the honor or reputation of a party or witness unless required by the justice of the cause with which I am charged;

"I will never reject from any consideration personal to myself the cause of the defenseless or oppressed, or delay any man's cause for lucre or malice." Rules Governing Admission to the Bar, rule 5, 1953 Comp. following section 18-1-8.

To hold otherwise than we do, we would have to state that the petitioner has proved to us that he is a man of good moral character for the purpose of being given the office of attorney. We do not hold this conviction. Accordingly, it must be ruled that petitioner's application to take the bar examination of the State of New Mexico is denied.

It is so ordered.

COMPTON, C. J.; and LUJAN and SADLER, JJ., concur.

KIKER, J., to file dissenting opinion at later date.

KIKER, Justice (dissenting).

The applicant after being notified, according to the record, that he might take the examination and after having appeared on the date the examination was to begin was interviewed by the members of the Board of Bar Examiners and then told he would not be allowed to take the examination.

The reasons given by the Board for declining to allow the applicant to take the examination were contained in a motion which was unanimously carried:

"* * * for the reason that, taking into consideration the use of aliases by the applicant; his former connection with subversive organizations, and his record of arrests, he has failed to satisfy the Board as to the requisite moral character for admission to the Bar of New Mexico."

After applicant had been denied the privilege of taking the examination, he wrote a letter to the Board in which he said:

"* * * If after you have reconsidered the question and your answer is still the same, I would appreciate being given an opportunity to appear personally before the Supreme Court when you certify the question to them."

Later, in the month of July 1954, the applicant was given a hearing before the Board. At this hearing the applicant testified at length—this was at Albuquerque. In addition to the applicant the following witnesses testified briefly in his behalf: Mrs. Schware, applicant's wife; Rabbi Moshay P. Mann of Albuquerque, who is the Rabbi

322

of the Congregation B'Nai Israel; Julia R. McCulloch, secretary to the dean of the law school at the University of New Mexico; and Monroe Fox, an attorney practicing at Chama. There were also seventeen letters which applicant got from students at the law school from professors present at the University when applicant was getting together testimony as to his character.

At that hearing no witnesses appeared to show want of good character on the part of applicant. The result of the hearing was that the Board of Bar Examiners affirmed the position taken by it at the time applicant applied for the examination on February 26, 1954 and so the application stood denied by the Board of Bar Examiners until the opinion of the majority was filed.

The majority, in the opinion, discusses the three reasons assigned by the Board of Examiners for refusing to allow applicant to take the examination February 26, 1954. The first of these is the use of aliases beginning more than twenty years before the date of the examination and continuing from time to time over a period of approximately eight years.

When applicant was eighteen years of age, after graduating from high school, he worked for a time in a hotel at Monticello, New York. Leaving Monticello on his way into New York City, he came to a town called Gloversville where a large part of the population was Italian and where the workers at the factory were practically all Italian. He applied for a job and adopted the name of Rudolph Di Caprio and used that name while working there. He gave two reasons for the use of this name at different times and the majority seems to think the reasons are wholly inconsistent and show a tendency to falsehood. He explained in his application that since practically all the workers were Italian he thought in order to organize a union he would be more effective using the Italian name. He was dark and could easily pass for Italian. He stated at the hearing that he used this alias at the factory for the purpose of getting a job and did get a job working with Italians at that factory.

I do not see any great inconsistency between the two statements. Being a Jew, he must have felt as he said he did, that he probably could not get a job there and he would be unable to organize a union if he did. When the workers were organized into a local union, they affiliated with the A. F. of L. after which applicant left for his home in New York City and resumed use of his own name. There is no evidence to show that the A. F. of L. failed to investigate the union before taking it into its organization as an affiliate and I have never heard of the A. F. of L. being charged with being Communist or having engaged in any subversive activities.

The statement made by applicant, as shown in the majority opinion, discloses the fact that he worked in Los Angeles, San Pedro, San Francisco and Berkeley, California from 1934 to 1937 and during that time he worked under the name of Rudolph Di Caprio. He explained this fact stating that at none of the places where he worked in shipyards, as longshoreman and warehouseman were any Jews employed. The employees were almost entirely Italian and so applicant used the name Di Caprio.

There is no hint or suggestion in the record made at the hearing given applicant in Albuquerque that he at any time used the name for the purpose of defrauding any person.

Applicant also used another Italian alias on the occasions of several arrests about which he told the Board of Bar Examiners. The name used was Joe Fliari or Joe Fliori. He told the Board that he made a special trip to California for the purpose of ascertaining the number of times he was arrested at San Pedro. He stated that he was arrested twice in the course of a strike and that approximately three thousand people were arrested during the period of sixty-six days of the strike and that of these, two hundred men, of whom he was one, were arrested on a charge of suspicion of criminal syndicalism. He had been working under the name of Rudolph Di Caprio before being arrested, but when arrested he gave the police the name of Joe Fliori. He state

that it had been a long time since the arrest occurred and that he supposed that the reasons for using that alias was fear that the company for which he had been working might not allow him to return to work. Nobody was or could have been defrauded by the use of that name. It is not shown that applicant intended to defraud anybody by its use.

In 1940 applicant was arrested in Detroit on a charge of violation of the Neutrality Act which became Federal Law in 1818 and which was revised in 1909 and now appears as Sec. 959, Title 18 U.S.C.1952 Ed.; since 1909 the law has not changed and was in effect in 1940 and is as follows:

"(a) Whoever, within the United States, enlists or enters himself, or hires or retains another to enlist or enter himself, or to go beyond the jurisdiction of the United States with intent to be enlisted or entered in the service of any foreign prince, state, colony, district, or people as a soldier or as a marine or seaman on board any vessel of war, letter of marque, or privateer, shall be fined not more than $1,000 or imprisoned not more than three years, or both."

The majority opinion quotes briefly a portion of the testimony given by applicant at the close of his examination with reference to the Detroit arrest. I quote that which precedes that quoted by the majority.

"Q. You have spoken about arrests, you testified to the arrest for criminal syndicalism twice in San Pedro, California, were you ever arrested on any other occasion? A. Yes, I was arrested in 1940.

Q. "Where? A. In Detroit, Michigan.

"Q. And what was the charge? A. Well, I have attempted to obtain a copy of the indictment and the order of release and I corresponded with an attorney in Detroit, who defended me at that particular time and so far he has not sent down the copy of the indictment or the order of release although I believe he has kept my check which I tendered to him.

"Mr. White: Did you plead guilty to the indictment or not guilty? A. I pleaded not guilty. I believe the charge was—

"Mr. White: It was read to you, wasn't it? A. I believe it was a violation of the neutrality act, it was the statute, I believe, of June 2, 1818, violation of the neutrality act.

"Mr. Dunleavy: Was that as a result of attempts that you had made, and you describe in one of your letters, of obtaining recruits for the fight against Franco in Spain? A. Yes.

"Q. Were you ever brought to trial? A. No, we were not brought to trial. Ten days after our arrest, my arrest the indictment was nol prossed. I believe the Attorney General of the United States said that inasmuch as the case had not been brought to trial when it was fresh and inasmuch as the Spanish government had granted amnesty to quite a number of people who had participated, in the country itself, that there was no reason for pressing charges and I was released.

"Q. Were you ever arrested again or at any other time? A. I was arrested on one other occasion."

Though the applicant used the words "I, myself, had volunteered to go to Spain" in that quotation it cannot be said he had enlisted or entered himself, or hired or retained any other to enlist or enter himself or that he at any time went beyond the jurisdiction of the United States with intent to be enlisted or enter service of any foreign people as a soldier or other warrior. From that which is contained in the record he could not have been convicted if he had been tried on this charge as plainly appears from the wording of the statute and from the only testimony offered on this subject.

Applicant was again arrested at some town in Texas the name of which town he does not remember, while driving a car for a friend to California. According to the

sole testimony on the subject he had all the papers authorizing him to take the car from Detroit to California for a friend. He had taken the southern route through Texas because it was wintertime. The police held him, though he had all papers authorizing him to have the car in possession, for two or three days then released him and returned all his possessions taken from him. No charges were ever preferred against him on that charge. The record does not show which name he used in this arrest. It does show in other testimony that applicant, after he left the Communist party in 1940, used the name which he acquired at birth, at all times; but even if he had made use of the name Joe Fliori which he did when arrested on other occasions, I think it would have made no difference, as there is positively nothing in the record to show anybody was defrauded or that it was intended by applicant by the use of an alias at any time that anybody should be defrauded or wrongfully deceived. The exact date when the Texas arrest occurred doesn't show in the Transcript of the hearing held at Albuquerque but after leaving the Communist party in 1940 applicant got work and being in Detroit a friend arranged with him to drive his car out to California, so that the incident must have occurred in 1940.

The record does show that during at least eleven years before applying to take the examination, applicant used his own name on all occasions.

The use of an alias when it is not intended to and does not deceive another, or others, to their injury and when it does not defraud another, or others, is not unlawful.

65 C.J.S., Names, § 9 a, states:

"* * * in the absence of statutory prohibition, a person, without abandoning his real name, may adopt or assume any name, wholly or partly different from his name, by which he may become known, and by which he may transact business, execute contracts, and carry on his affairs, unless he does so in order to defraud others, * * *."

See the multitude of cases cited therein in this regard.

Some years ago, to illustrate, I was asked by a worthy New Mexico citizen who had been long in business in New Mexico and who was a well established and highly respected citizen in his community, to institute the necessary proceeding to change his name. I inquired as to what name he desired to take and he said, "the name by which you have known me for a good many years". It developed that he was of Polish extraction and the name of his father was so lengthy that when he went to work for another in the business for which his training qualified him he shortened his name and had been known by the assumed

name for many years. I explained to him that he might go on permanently using the name he adopted without resort to any court, but his desire to have a judgment of a court in the matter was founded on the thought that he might sometime want to make a trip to the country his parents came from and that he might have difficulty obtaining a passport under the name of his birth since he had been known so long under another name. A judgment of court was obtained according to his desire; but the statute under which the proceeding was instituted was permissive only and did not require my client so to proceed.

To further illustrate, some of the greatest people in history have been better known by an alias than by the name of their birth. Mark Twain is better known than is Samuel L. Clemens; Mr. Dooley is far better known to people of my generation than is F. Peter Dunne; O. Henry is probably better known than is William Sydney Porter; Abraham is far better known than is Abram, the original name of the same man; Paul the Apostle is far better known, I think, than Saul of Tarsus, his former name. Many of the most prominent actors and actresses who have worked in Hollywood since the establishment of the motion picture enterprise in that city have been known by names other than the names to which they were born. No law at any time ever prevented or does now prevent a change of name without fraudulent in-

tent, as is shown by the authorities above cited.

The second reason assigned by the Board of Bar Examiners for declining to permit applicant to take the bar examination was his former connection with subversive organizations. As pointed out in the majority opinion, applicant, according to his own declaration, joined the Young Communist League in his senior year at high school. Whether that connection ended upon his graduation at the end of the school year does not appear. He joined the Communist party in 1934 and continued to be a member of that party as it then existed in this country until 1937 when he left the party. After 1937, at some date not stated, applicant joined and remained a member until 1940, when, according to his own declaration, he found the protestations of the leaders of the party as to their interest in man as an individual were false. He decided, so he declared, that the interest of the leaders was in their own welfare and so he left. This is his declaration. There is no other evidence in the record except that supplied, as to membership in the Communist party, by applicant.

The opinion of the majority points out that the Communist party was regarded in a far different manner during the time applicant was a member of it than at the present time. Applicant called the attention of the Board of Bar Examiners to the

fact that in the year 1948, and years prior thereto, there was a national Communist ticket. Evidence of membership in the Communist party at a time fourteen years and more before the application to take the bar examination and with additional evidence that within that fourteen year period applicant took a solemn oath in the armed service of the United States of America to uphold and defend the Constitution and laws of this country and spent more than three years of such service as entitled him to an honorable discharge from the armed ranks, is not sufficient, in my opinion, to show want of good moral character of the applicant; and this is particularly true when it is shown that during the five years immediately preceding the date of application the applicant was of good moral character, at two educational institutions he attended during that time, and in the communities where he lived, three years having been spent at the law school at the University of this state.

If the evidence in this case leaves any lingering suspicion that applicant may still in his beliefs cling to Communist theories, I think that the least that could be done about the matter of his eligibility to take the bar examination would be to bring him, with his legal representative and members of the Board of Bar Examiners, before the court for such representations as might be made as to the present activities of the applicant as to subversive matters.

The majority makes much of the writing of a letter by applicant to his wife in 1944 after applicant had been in the armed services of this country for approximately a year and while he was on his way to the South Seas to fight and die, if necessary, for his country and for those of us who were unable to fight for ourselves. In that letter written to his wife applicant spoke with high praise of the Fair Employment Practices Commission and charged that white supremacy is a tool of southern Bourbonism to continue in power at the expense of the south itself and the nation as a whole and said:

"Jim-Crow is on a par with Anti-Semitism, anti-Catholicism, anti-Communism. In a democracy one cannot discriminate against a minority."

Later in the same letter applicant wrote that all the above "anti's" are:

"* * * most dangerous and stupid mistakes for Americans to make. They violate Christian ethics as well as all other ethical principles that recognize the brotherhood of man. To top it all off, consider them immoral."

This letter speaks only of mental attitudes and beliefs. It is not difficult for me to understand how a young man, recently married, might display an ambitious desire to appear as a great philosopher to his recently wedded sweetheart from whom he must now be separated for a time. Though I cannot subscribe to the philosophy ex-

pounded by the writer as to some of his declarations, I think he might have been speaking of matters as he understood them to be at the time. Both Republicans and Democrats at that time were naturally opposed to the Communist party, but all recognized that it was the legally qualified exponent of its beliefs to the electorate of the United States.

I do not think this letter was inadvertently offered in evidence by applicant's attorney. It is unfortunate that death has removed the attorney for applicant and he cannot now tell us why the letter was offered in evidence; but I think it was offered for the same reason applicant so freely told the members of the Board of Bar Examiners of his life's activities from the time he began working at nine years of age until he completed his educative efforts which brought him to the point of readiness to take the bar examination.

I think applicant was denied the privilege of taking the bar examination on the suspicion that he still has beliefs of Communism as it is now known to exist rather than as known to exist at the time applicant was a member of the Communist party. When applicant left the Communist party he used language quite like that used by Mr. Justice Jackson at one place in his opinion in American Communications Association v. Douds, 339 U.S. 382, 70 S.Ct. 674, 702, 94 L.Ed. 925. The opinion just referred to concurs in part with the majority opinion and dissents in part. The majority opinion points out certain declarations of Mr. Justice Jackson with all of which I fully agree; but in that opinion the writer was speaking as of May 8, 1950, the date of the decision, and not as of 1944.

The opinion of the majority quotes from the opinion of Mr. Justice Jackson in American Communications Association v. Douds, supra, a declaration made by Mr. Justice Jackson as to what the Communist party actually is and the principles for which it stands. The case before the court and on which Mr. Justice Jackson wrote was one brought to test the constitutionality of the National Labor Relations Act as amended in 1947, 29 U.S.C.A. § 151 et seq. The act provided that the board would not investigate any question affecting commerce concerning representations of employees raised by a labor organization and that no such petition would be entertained unless there be on file with the board an affidavit executed in the time stated, by the officers of such an organization that the officer is not a member of the Communist party or affiliated with such party and,

"* * * that he does not believe in, and is not a member of or supports any organization that believes in or teaches, the overthrow of the United States Government by force or by any illegal or unconstitutional methods."

Having considered the Communist party and the propriety of the requirement as to membership in the Communist party, Mr. Justice Jackson wrote:

"I conclude that we cannot deny Congress power to take these measures under the Commerce Clause to require labor union officers to disclose their membership in or affiliation with the Communist Party."

Turning to the requirement of the oath as to a belief of the officers of the union Mr. Justice Jackson wrote boldly of his belief in fundamental constitutional principles. Among other things:

"Progress generally begins in skepticism about accepted truths. Intellectual freedom means the right to re-examine much that has been long taken for granted. A free man must be a reasoning man, and he must dare to doubt what a legislative or electoral majority may most passionately assert. The danger that citizens will think wrongly is serious, but less dangerous than atrophy from not thinking at all. Our Constitution relies on our electorate's complete ideological freedom to nourish independent and responsible intelligence and preserve our democracy from that submissiveness, timidity and herd-mindedness of the masses which would foster a tyranny of mediocrity. The priceless heritage of our society is the unrestricted constitutional right of each member to think as he will. Thought control is a copyright of totalitarianism, and we have no claim to it. It is not the function of our Government to keep the citizen from falling into error; it is the function of the citizen to keep the Government from falling into error. We could justify any censorship only when the censors are better shielded against error than the censored."

The next quotation we take from this opinion of Mr. Justice Jackson upon which the majority placed considerable reliance expresses in very splendid language, very clearly, the idea of which applicant in this case had formed as he stated it and which he said was his reason for leaving the Communist party. The applicant said he came to the realization that the beautiful words declared by the leaders of the Communist party showed a lack of interest in the individual and a desire for power on the part of the leaders and the leadership did not care what happened to the other people. Having so concluded he said that he finally and definitely left the Communist party. Mr. Justice Jackson states:

"The idea that a Constitution should protect individual nonconformity is essentially American and is the last thing in the world that Communists will tolerate. Nothing exceeds the bitterness of their demands for freedom

for themselves in this country except the bitterness of their intolerance of freedom for others where they are in power. An exaction of some profession of belief or nonbelief is precisely what the Communists would enact— each individual must adopt the ideas that are common to the ruling group. Their whole philosophy is to minimize man as an individual and to increase the power of man acting in the mass. If any single characteristic distinguishes our democracy from Communism it is our recognition of the individual as a personality rather than as a soulless part in the jigsaw puzzle that is the collectivist state."

It strikes me that applicant in this case at the time he left the Communist party was thinking along the same straight lines, and that his rebirth to the principles of democracy is no more strange than his passing from disbelief in God to faithful adherence to the religion of his birth.

In the opinion of the majority in American Communications Association v. Douds, supra, Mr. Chief Justice Vinson wrote:

"* * * In this legislation, Congress did not restrain the activities of the Communist Party as a political organization; nor did it attempt to stifle beliefs. Compare West Virginia State Board of Education v. Barnette, 1943, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed.

1628. Section 9(h) touches only a relative handful of persons, leaving the great majority of persons of the identified affiliations and beliefs completely free from restraint. And it leaves those few who are affected free to maintain their affiliations and beliefs subject only to possible loss of positions which Congress has concluded are being abused to the injury of the public by members of the described groups."

The few of whom the court there spoke were officials of labor unions and they were the only members of labor unions as to whom an oath as to affiliations or beliefs was required.

The full opinion as written by Mr. Chief Justice Vinson was concurred in by three members of the court. Mr. Justice Frankfurter concurred in all portions of the opinion except that numbered 7 to which he dissented. This is not important to consider in our case.

Mr. Justice Black begins his dissenting opinion in American Communications Association v. Douds:

"We have said that 'Freedom to think is absolute of its own nature; the most tyrannical government is powerless to control the inward workings of the mind.'"

Again Mr. Justice Black said:

"Since § 9(h) was passed to exclude certain beliefs from one arena of the national economy, it was quite natural to utilize the test oath as a weapon. History attests the efficacy of that instrument for inflicting penalties and disabilities on obnoxious minorities. It was one of the major devices used against the Huguenots in France, and against 'heretics' during the Spanish Inquisition. It helped English rulers identify and outlaw Catholics, Quakers, Baptists, and Congregationalists—groups considered dangerous for political. as well as religious reasons. And wherever the test oath was in vogue, spies and informers found rewards far more tempting than truth. Painful awareness of the evils of thought espionage made such oaths 'an abomination to the founders of this nation,' In re Summers, 325 U.S. 561, 576, 65 S.Ct. 1307, 1315, 89 L.Ed. 1795, dissenting opinion. Whether religious, political, or both, test oaths are implacable foes of free thought. By approving their imposition, this Court has injected compromise into a field where the First Amendment forbids compromise.

"The Court assures us that today's encroachment on liberty is just a small one, that this particular statutory provision 'touches only a relative, a handful of persons, leaving the great majority of persons of the identified affiliations and beliefs completely free from restraint.' But not the least of the virtues of the First Amendment is its protection of each member of the smallest and most unorthodox minority. Centuries of experience testify that laws aimed at one political or religious group, however rational these laws may be in their beginnings, generate hatreds and prejudices which rapidly spread beyond control. Too often it is fear which inspires such passions, and nothing is more reckless or contagious. In the resulting hysteria, popular indignation tars with the same brush all those who have ever been associated with any member of the group under attack or who hold a view which, though supported by revered Americans as essential to democracy, has been adopted by that group for its own purposes."

The quotations are taken from both Mr. Justice Jackson and Mr. Justice Black because I understand the majority of this court to rely solely on the proposition that at one time in his life, at least fourteen years before applying for admission to the bar, applicant was a member of the Communist party.

No evidence appears in the record that in the year 1954 applicant was or had been for a period of fourteen years a member of the Communist party.

In the record of the hearing held at Albuquerque this question was asked of applicant with the answer that follows:

"Q. Regardless of whether it is Malencoff or Stalin or the Twelve Apostles in charge of the Communist party, if you took that oath you cannot be a Communist, is that right?

"A. I am not a Communist."

The oath referred to in the question is the oath required of an attorney being admitted to the bar.

We quote from that record again:

"Q. Now then, that leads me down to this question concerning yourself, you stated that you left the Communist party because of your having reached the conclusion that the aims of those in charge of the policies of the Communist party were personal advancement and what not, rather than a belief in the principles, basic principles of the Communist party. That to me still leaves a doubt in my mind as to whether or not you still believe in the basic principles of the Communist party so that if at some time, let me ask you this question, suppose that the ruler of Russia today were to be overthrown and to the eyes of the Communist, the control of the Communist party was restored to sincere Communists, those that believe in principles of Communism, that condition existed, do you still believe in those principles to the extent that you would again join the Communist party?

"A. Never, never!

"Q. And then you say that you are not only, while you may have left the party originally because you didn't believe that the leaders were sincere, you now say that you do not believe in the principles of Communism?

"A. I am saying, Judge, that for myself I would never join the Communist party. I would never join the Communist party."

In Dennis v. United States, 341 U.S. 494, 71 S.Ct. 857, 863, 95 L.Ed. 1137, the United States Supreme Court in an opinion by Mr. Chief Justice Vinson, discussing the Smith Act, 18 U.S.C. § 2385, said:

"The very language of the Smith Act negates the interpretation which petitioners would have us impose on that Act. It is directed at advocacy, not discussion. Thus, the trial judge properly charged the jury that they could not convict if they found that petitioners did 'no more than pursue peaceful studies and discussions or teaching, and advocacy in the realm of ideas.' He further charged that it was not unlawful 'to conduct in an American college or university a course explaining the philosophical theories set forth in the books which have been placed in evidence.' Such a

charge is in strict accord with the statutory language, and illustrates the meaning to be placed on those words. Congress did not intend to eradicate the free discussion of political theories, to destroy the traditional rights of Americans to discuss and evaluate ideas without fear of governmental sanction. Rather Congress was concerned with the very kind of activity in which the evidence showed these petitioners engaged."

Mr. Justice Frankfurter in the Dennis case, supra, in a concurring opinion, wrote:

"No matter how clear we may be that the defendants now before us are preparing to overthrow our Government at the propitious moment, it is self-delusion to think that we can punish them for their advocacy without adding to the risks run by loyal citizens who honestly believe in some of the reforms these defendants advance. It is a sobering fact that in sustaining the convictions before us we can hardly escape restriction on the interchange of ideas.

"We must not overlook the value of that interchange. Freedom of expression is the well-spring of our civilization—the civilization we seek to maintain and further by recognizing the right of Congress to put some limitation upon expression. Such are the paradoxes of life. For social develop-

ment of trial and error, the fullest possible opportunity for the free play of the human mind is an indispensable prerequisite. The history of civilization is in considerable measure the displacement of error which once held sway as official truth by beliefs which in turn have yielded to other truths. Therefore the liberty of man to search for truth ought not to be fettered, no matter what orthodoxies he may challenge. Liberty of thought soon shrivels without freedom of expression. Nor can truth be pursued in an atmosphere hostile to the endeavor or under dangers which are hazarded only by heroes."

There is an appendix to the opinion of Mr. Justice Frankfurter pointing to opinions holding that speech cannot be restricted constitutionally unless there would result from it an imminent—close at hand—substantive evil.

The cases cited and quoted from illustrate the view taken by the highest court of the land as to any effort to control the thought processes of any individual. A mere belief in some proposition which is not orthodox when viewed from the standpoint of most people is not sufficient to condemn one as of bad moral character. The quotation taken from the majority opinion in American Communications Association v. Douds, supra, shows clearly that it is not membership alone in a party

which was condemned. The oath required by the statute was of only a few individuals in that party who were in a position of leadership and whose authority and position might enable them to lead the masses of adherents to the beliefs and doctrines of that party to forcible action against the government.

In the recent case entitled "In the Matter of Application of Ben G. Levy for Admission to Practice In the United States District Court, Southern District of Texas" the application was first considered by three District Judges. The matter involved the good moral character of applicant and nothing else. Applicant was a member of the bar of the State of Texas. The charge upon his character was based on the fact that he had been associated with an attorney practicing in the courts of Texas who was generally reputed to be a member of the Communist party. Applicant was denied admission to the District Court and thereupon took an appeal to the Court of Appeals where the judgment of the lower court was affirmed. 5 Cir., 214 F.2d 331. Next the matter was taken to the Supreme Court of the United States where the following opinion was rendered:

"Per Curiam. The record in this case discloses no sufficient grounds for the failure and refusal of the District Court to grant petitioner's application for admission to the bar of that Court. The judgment of the Court of Appeals is accordingly reversed with direction to remand the cause to the District Court for appropriate action in accordance with this order." 348 U.S. 978, 75 S.Ct. 569, 99 L.Ed. ——.

A very recent case involving moral character of an applicant for admission to the bar of the state of Florida is, Coleman v. Watts, filed May 11, 1955, rehearing denied June 3, 1955, 81 So.2d 650, 651.

In that case it is shown that applicant is an attorney duly admitted to practice in the courts of Ohio. In October 1953 applicant filed an application for permission to take the bar examination. In further stating the facts the Supreme Court of Florida said:

"* * * the Board presumably developed certain information concerning petitioner's moral fitness, which was derogatory in nature, and Coleman was requested to appear before the Board on March 12, 1954, for interrogation. At that time, and upon a later occasion, questions were propounded to Coleman by Board members on a wide variety of subjects, including the amounts and sources of his income for past years, and taxes paid thereon; his net worth; his past employments; his business transactions and his associates during his residence in Naples, Florida, since 1946; his personal relationship with his employer's wife at that time, and the

purported receipt of a gift of a house by deed executed by the wife containing restrictions on disposition at her option. Inquiries were also made as to whether or not the petitioner had ever engaged in 'kick-back' business transactions in connection with his work in real estate development at Naples, and whether or not he had served illegitimately as a 'tax front' for certain business associates."

The petitioner was the only witness; all derogatory allusions or derogatory accusations were flatly denied by him. Again we quote from the opinion:

"* * * the Board members did not at any time specify, either generally or specifically, what acts of malfeasance, if any, had been reported to it of which the petitioner might be guilty. Thereafter, the petitioner was informed by the Board that his application to take the examination had been denied because 'he did not meet the requirements for admission to the Florida Bar,' but that he might avail himself of the privilege of a rehearing by producing before the Board, within a sixty-day period, 'new and additional matter which had not previously been considered.'"

After being so advised by the Board the petitioner took the matter to the Supreme Court by certiorari to secure review of the ruling of the Board. Again we quote from the opinion:

"Upon the allegations of the petition, which have been set forth here only in substance, the petitioner charged that the Board, in denying him the right to take the examination without at least informing him of the general nature of the complaints and charges and allowing him an opportunity to refute them, 'did not proceed according to the essential requirements of the law, exceeded and acted without jurisdiction or authority in the premises, illegally and unlawfully took away (from) and denied to * * * petitioner a right granted to other members of the class of which petitioner is a member and denied petitioner the due process of law.'"

The court considered the cases found in the annotations to 28 A.L.R. 1140 and 72 A.L.R. 929 and discussed cases from Oregon, California, Wisconsin, Montana, Georgia, West Virginia, New York, the Court of Appeals for the District of Columbia, Indiana, and North Carolina. We now quote the principles relied on in that case for quashing the ruling of the Board of Bar Examiners and directing that a hearing be afforded applicant in conformity with the principles stated in the opinion.

"It would seem, then, either by virtue of specific holdings, or by necessary

336

implication, in the many cases dealing with the point, that where a court is asked to review the merits of a board's rejection of an application for admission to the bar, annotations 28 A.L.R. 1140, 72 A.L.R. 929, it is incumbent upon the board to sustain its ruling by *record* evidence and not by mere assertions that it is possessed of confidential information which shows the applicant to be unfit; and if the record consists only of evidence supplied by the applicant, then such evidence must demonstrate that the board's dissatisfaction with his application rests on valid grounds and not upon mere suspicion. Although the burden is always upon the applicant to 'satisfy the Board of his or her moral standing,' we have the view that when he has made the prima facie showing required by the statutes and rules governing admission to practice, 'it is incumbent upon those making objections to offer evidence to support the same and to overcome the prima facie showing made by the applicant. It is not for the applicant to prove the falsity of the charges made against him.' While the burden of proof never shifts, the burden of proceeding does."

I feel confident that the record before us does not·show conclusively or even per-. suasively that the proceedings of the·Board. of Bar Examiners met' the tests, ·stated in·.

the· quotation, and which are approved by the cases cited in the opinion.

Applicant in our case was denied the privilege of taking the bar examination at the time of his appearance before the Board sitting for that purpose, as he had been advised previously that he might take the examination at that time. The board had before it certain information undisclosed to applicant which led the Board to hold an interview with him and to make certain inquiries of him of which no record was made except a record of a motion carried unanimously by the Board to the effect that applicant be denied the privilege of taking the bar examination because of subversive activities, aliases and arrests. He was not then advised, as I understand, of any reason for the questions which were asked him and he was not told the substance, even, of anything contained in the "Confidential File". At the hearing held in Albuquerque the applicant by his attorney asked for information as to the contents of the "Confidential File" held by the Board. He was informed that he could not have that and the hearing proceeded so far as anything against the applicant is concerned upon his statements only. There is a statement made by the Bar Examiners which is before the court that the Board did not rely upon the confidential information in reaching its decision but based the decision upon the statements by the applicant.

As said above the applicant was denied the privilege of taking the examination when he appeared for that purpose. The result of the hearing at Albuquerque was the affirmation of its previous action in refusing to permit the applicant to take the examination. In this court applicant has complained of the failure to allow him to know about the reports in the "Confidential File".

There is one other reliance for its action by the Board in its denial to the applicant of the privilege of taking the bar examination and that is the arrests of the applicant.

It is true applicant was arrested several times, but he was never tried or convicted for anything. He has no criminal record and it has been many years since he was last arrested.

If one were on trial for a criminal action mere arrests without convictions would not be shown for any purpose. For impeachment a defendant may be asked if he ever has been convicted of a misdemeanor or a felony. The details of the proceedings leading to a conviction are not admissible as evidence. It seems to be a fact that applicant disclosed the fact of his arrests in explaining the use of an alias at different times. Since the record does not show any evidence of a fraudulent purpose in the use of an alias, bad moral character can not be established thereby. Just as a consideration of aliases is wrong in the absence of a showing of fraudulent intent, so is the con-

sideration of arrests many years ago when there were no charges filed in some instances and no convictions ever. The good moral character of an individual may be attacked if put in issue by proof of his general reputation in the community for any damaging trait. It is not to be established by specific instances of what may be, or may be thought to be, wrongful acts. Proof of a general reputation of bad character at a remote time is not admissible.

There is nothing in the record to show want of good moral character since January 1943. There is little if anything in the record other than applicant's beliefs, to show bad moral character at any time. There is only one act of applicant's life which suggests criminal conduct and that was when he was soliciting others to go to Spain with him and to there enter the Loyalist Army of that country. Applicant said he did not know the statute was in existence at the time he was asking others to go with him to Spain to enlist. It is not surprising that he did not know of the statute. There are many of us all over this country to whose attention that statute had not been called until necessity for its consideration arose.

I have referred above to the "Confidential File". It is pointed out in the majority opinion in this case that I am the only member of the court who has read the "Confidential File". In this connection I

feel justified in saying that by assignment this case first came to me for writing an opinion. On beginning to study the case I undertook to read and did read every paper in the files, including the "Confidential File". I not only read the instruments once, I have read all of them, including the "Confidential File", several times. The result of my studies at that time led me to prepare a memorandum suggesting that this court call before it the applicant with his attorney and the members of the Board of Bar Examiners for further consideration of the matter. The other members of this court did not agree with me but concurred in the opinion to which I now dissent.

I think applicant was entitled to know at least the substance of any derogatory information given to the Board of Bar Examiners in the "Confidential File". I think every member of this court owes it to the applicant, on review here of the action of the Board of Bar Examiners, to know the contents of the "Confidential File".

I do not believe that the applicant has been accorded the rights of freedom guaranteed him by the Federal Constitution or by the State Constitution or that he has had due process, by the proceedings had.

That which I have said in this opinion is in no way a criticism of any member of the Board of Bar Examiners or of that Board. All men make mistakes. I know the members of this Board individually and am sure that no member of the Board would consciously or intentionally do any applicant a wrong. I appreciate also the sacrifices of time and effort which the examiners must make in order to hold the examinations and pass upon the eligibility of applicants for admission. In this case, however, I think an error has been made and that it should be corrected by an order of this court directing the Board of Bar Examiners to permit applicant to take the bar examination.

For the reasons above stated, I dissent.

## On Rehearing

■ Petitioner in his motion for rehearing is chiefly dissatisfied with the type of hearing he was given in this court, asserting the court should have ordered a personal hearing before it and requesting now that such hearing be given. As stated in our opinion, a request for personal hearing was made by petitioner, but this request was withdrawn as being premature by letter of May 21, 1954. No further request for hearing was made and the case was presented to us, briefed and orally argued, all with reference to the record of hearing before the Board of Bar Examiners held July 16, 1954. The question presented to us was whether applicant had established his good moral character so as to entitle him to take the examination for membership in the bar in this state. Petitioner was given pre-

cisely the hearing before this court which he sought.

Petitioner is also dissatisfied because we did not rule whether former membership in the Communist Party alone establishes a lack or absence of good moral character. The answer to this is the question was not and is not now before us. We stated in our opinion and we reiterate here:

"We believe one who has knowingly given his loyalties to such a program and belief for six to seven years during a period of responsible adulthood is a person of questionable character."

This conduct of petitioner, together with his other former actions in the use of aliases and record of arrests, and his present attitude toward those matters, were the considerations upon which application was denied.

In connection with the matter of the arrest in Detroit, Michigan, for violation of the Neutrality Act we take this opportunity to dispel some doubt which may have arisen about the events leading thereto and the appropriateness of criminal prosecution under c. 321, § 10, March 4, 1909, 35 Stat. 1089 (substantially the same as the present § 959(a), Title 18 U.S.C.A.)

Said § 10 provides:

"Whoever, within the territory or jurisdiction of the United States, enlists, or enters himself, or hires or retains another person to enlist or enter himself, or to go beyond the limits or jurisdiction of the United States with intent to be enlisted or entered in the service of any foreign prince, state, colony, district, or people, as a soldier, or as a marine or seaman, on board of any vessel of war, letter of marque, or privateer, shall be fined not more than one thousand dollars and imprisoned not more than three years."

Mr. Justice Kiker in his dissent filed herein has asserted that petitioner's activities were not such that he could have been convicted under the statute. Either Mr. Justice Kiker has construed the statute in a manner at odds with the authorities (Gayon v. McCarthy, 1920, 252 U.S. 171, 40 S.Ct. 244, 64 L.Ed. 513; United States v. Blair-Murdock Co., D.C.Cal.1915, 228 F. 75, reversed on other grounds, 9 Cir., 1917, 241 F. 217, certiorari denied, 1917, 244 U.S. 655, 37 S.Ct. 742, 61 L.Ed. 1374, which interpret the words "hire or retain" as meaning "engage" in the clause reading, "Whoever * * * hires or retains another person to enlist or enter himself," and the word "himself" in this connection refers to its antecedent "another person"); or he has ignored the following portions of letters from petitioner to his wife, introduced in evidence as exhibits. From the letter of May 9, 1944, we read:

"* * * The question of my enlisting to fight on the side of the Spanish Republicans against, Franco, Hit-

ler & Mussolini. Was in Detroit at the time. In my position as Secretary of the Wayne County Workers Alliance and also as Chairman of the Single Men's Unemployed League (more on this organization later) was very strategically placed for getting recruits to go across.

"And much as I hated it, because I was doing such a good job they kept on putting off and off my own date of departure. Finally put my feet down and insisted I be allowed to go. By this time it was getting toward the end. Finances were low. Arrived in New York with two auto workers. Were given a weeks vacation.

"The boys were now going across without passports and stowing away on ships going to France. 'Twas a beautiful system elaborately worked out and couldn't have been successful if the crews weren't overwhelmingly sympathetic to the cause.

"Remember now as if it had just happened. There were 5 of us. Two from San Francisco, us three from Detroit. One morning the S. F. boys left and came back the next day. They had gotten caught. Were unfamiliar with ships. That afternoon the announcement, 'We will only be able to send four. One of you will have to go back home.'

"A simple problem in arithmetic and finances. Cost less to send one person back to Detroit than San Francisco. The choice was left to us as to which one goes back. The 3 of us flipped coins. Two tails and one head fell. I had flipped a head. Given a bus ticket back to Detroit. Cursing my hard luck went back and resumed where I had left off. Thus ends a tale of how not to get to Spain. Incidentally of the last four who left, only one of the Detroit boys lived to come back."

In a letter written May 13, 1944, petitioner described a friendship he had developed with a man named Pete Kowal in Detroit, and stated:

"In mentioning Spain said that soon I would be going across, that someone would be needed to take my place, that despite his lack of experience, thru diligent study he was capable of being that person, that it meant hard work, something he was used to, and besides wherever he went he would run into the same conditions as existed in Detroit.

"He joined the party and decided to stick it out. From that nite we were inseparable. * * *

" * * * The next week the secretary we had wasn't doing so hot, ousted him and Pete elected in his place.

"Pete helped me with recruiting too.

As a result he was arrested with me by the FBI on February 6, 1940. Became a member of an exclusive club, the 59ers. All our prison numbers I believe started with 59."

Petitioner is also distressed over the fact the Board of Bar Examiners had access to certain confidential information already noted in our opinion and the fact the content of the file was not made known to him. As stated in our opinion, its author and the justices concurring therein at no time examined the content of this file. The sworn response of the Board of Bar Examiners to the original petition herein declared its recommendation was not based upon confidential information but upon facts disclosed by petitioner himself. Petitioner is now merely seeking to read some prejudice to himself into the proceedings where there is none in fact.

No answer can now be made to petitioner's request he be advised as to whether he will be permitted to take the bar examination at some future date. The answer to such a request will depend upon the showing then made and how it may be viewed by the Court.

Other matters argued upon the motion for rehearing are found to be without merit. The motion for rehearing is hereby denied. It is so ordered.

COMPTON, C. J., and LUJAN and SADLER, JJ., concur.

KIKER, Justice (dissenting).

The majority opinion, as I read it, permanently disqualifies the applicant from taking the bar examination. The language which I so interpret is quoted in the opinion on the Motion for Rehearing and is as follows:

"'We believe one who has knowingly given his loyalties to such a program and belief for six to seven years during a period of responsible adulthood is a person of questionable character.'"

If now, after fifteen years of unobjectionable conduct, three years of which were spent as a soldier in the service of the United States of America overseas, the applicant is a man of questionable character, then for him there can be no hope. If a man who became a member of a junior affiliate of the Communist party at the age of eighteen and later moved into the Communist party until he was twenty-six years of age, when he permanently separated from that party, is now of questionable character, even though during all of the years just mentioned the Communist party was recognized as much within the law as was the Republican party or the Democratic party, then it must be true that the individual will never be able to establish a character among his fellows which could justify his association with respectable people or his admission to any of the learned professions.

It is difficult for me to understand how the majority can seriously argue that the use of aliases, without intent to do harm to any individual or group of individuals, could so besmirch a man's character that he will be forever unfit for association with the respectable part of any community. It is, moreover, difficult for me to appreciate how the majority arrives at its conclusion that any number of arrests without a conviction of any offense whatever can forever condemn a man as one of questionable character.

In the discussion in the majority opinion of the arrest of the applicant at Detroit, Michigan, in 1940 for violation of the Neutrality Act, my name is used again, and it is suggested that I have entirely overlooked pertinent authorities or that I have failed to read certain letters written by the applicant in the year 1944 when he had taken the oath required of all soldiers and was enlisted in the service of our country. These letters do no more than expose to applicant's wife, five years after he had severed all connection with the then lawful Communist party, some of his activities in that party. In the majority opinion two cases are cited as instances of authorities which I may have overlooked in expressing my dissent to the original opinion of the majority in this case.

The first of these cases is Gayon v. McCarthy, 1920, 252 U.S. 171, 40 S.Ct. 244, 245, 64 L.Ed. 513. In that case the appellant, Gayon, was indicted in the Southern District of Texas for conspiring with one Naranjo of San Antonio, Texas, and of one Mendoza of Laredo, Texas, to hire and retain Foster Averitt, a citizen of the United States, to go to Mexico, there to enlist in the military forces organized in the interest of Felix Diaz then in revolt against the government of Mexico, with which the United States was at peace, in violation of what is called the Neutrality Act.

Gayon was arrested in New York and was held by a commissioner, subject to order of the District Court for his removal to Texas. Next, by petition for writs of habeas corpus and certiorari the case was removed to the District Court for the Southern District of New York; and there the Court discharged the writ of habeas corpus and entered an order and warrant issued for the removal of the appellant to Texas. The appeal was taken to the Supreme Court of the United States.

The Supreme Court said:

"If there was before the commissioner or District Court evidence showing probable cause for believing the defendant guilty of having conspired with Naranjo or Mendoza, when either was in the Southern district of Texas, to hire or retain Averitt to go to Mexico to enlist in the insurgent forces operating under General Diaz against the

Mexican government, the order of the District Court must be affirmed."

The Court examined the evidence. That before the commissioner was merely the indictment against the defendants and the admission by Gayon that he was the person named therein. The Court held that this established a prima facie case.

Thereupon, the testimony of the accused and of one Del Villar was offered by appellant and that of Averitt by the government. This evidence showed that Del Villar, a political exile from Mexico, had maintained offices in New York, from which he had conducted a systematic propaganda in the interest of Felix Diaz and against the Mexican government; that Gayon was a Mexican citizen and throughout several administrations prior to that of Carranza had served as consul for the Mexican government at several places within and without the United States, one of these being at Roma, Texas. For about two years Gayon had been in the service and pay of Del Villar and General Aurelio Blanquet, the latter being in Mexico with the forces of Diaz. Naranjo was editor and publisher of "Revista Mexicana", a newspaper at San Antonio, Texas, the paper being opposed to the established Mexican government and favorable to Diaz and his interests.

There was much correspondence between Gayon from New York to Naranjo at San Antonio. The correspondence disclosed that Gayon, although in New York was in close association with Naranjo and that the two were engaged actively in promoting opposition to the established Mexican government. In January, 1919 Foster Averitt, an American citizen living in Texas, called at the office of Gayon. Averitt had recently resigned from the United States Naval Academy and was without employment. His purpose in calling on Gayon was to secure, if possible, a position in Mexico or Central America as an engineer. Among other things, he expressed his desire to see Generals Diaz and Blanquet personally. He asked for letters of introduction to these men. Gayon refused until he could confer with Del Villar. Averitt called again and discussed with Gayon conditions in Mexico near the border and the means of his going to Mexico and later received from Gayon two letters, one addressed to each of the generals above named. Gayon asked General Blanquet to supply Averitt with necessary information to enable him to make his trip into Mexico. He also asked that Averitt be introduced to General Diaz. In the letter he also requested the general to write as often as possible to enable "us to continue our campaign of propaganda". Having received these letters, Averitt went immediately to San Antonio where he presented the letter to Naranjo who gave him a letter to General Mendoza at Laredo. This letter

was presented to Mendoza and through him arrangements were made for Averitt's crossing into Mexico with two or three others, but they were arrested by customs guards and the proceedings followed.

In the interviews had in New York there was suggestion of payment of expenses and a commission for Averitt, but Gayon said that the furnishing of either would violate the neutrality laws of the United States, but that there would be no difficulty in his getting a commission from General Blanquet on his arrival in Mexico and also said "that he expected that he should be at least a colonel when he saw him again down there". Gayon also said to Averitt that it might be possible to have his expenses made up to him when he arrived in Mexico, and, as a matter of fact, he received $15 from General Mendoza at Laredo.

As said above, the charge was conspiracy and the overt acts stated in the indictment were that Gayon delivered to Averitt in New York a letter addressed to Naranjo with instructions with respect to presenting it, and impliedly promised Averitt that upon his arrival in Mexico he would be given a commission in the army of General Blanquet and he also gave Averitt a letter to General Blanquet who was then in Mexico in command of revolutionary forces; that Averitt visited and held conferences with Naranjo who gave him a letter to Mendoza at Laredo in the southern district of Texas; and that Averitt called upon Mendoza and arrangements were made for him to enter Mexico with the intent to join the forces of Diaz under General Blanquet. The court says that it is evident that Gayon entered into the engagement by the promise that he would be given a commission in the forces of Diaz when he arrived there and that he would probably be reimbursed for his expenses.

This case was not concerned with the guilt of Gayon. The question was whether he should be removed to the southern district of Texas and the Court held that there was a case against him to be tried in the southern district of Texas. Instead of undertaking to quote a few words from the opinion out of the context for the purpose of explaining the meaning of the words "hire" or "retain", I quote from the opinion following:

"The word 'retain' is used in the statute as an alternative to 'hire,' and means something different from the usual employment with payment in money. One may be retained, in the sense of engaged, to render a service as effectively by a verbal as by a written promise, by a prospect for advancement or payment in the future as by the immediate payment of cash."

The second of the cases cited in the majority opinion is Blair v. United States, 9

Cir., 241 F. 217, certiorari denied 244 U.S. 655, 37 S.Ct. 742, 61 L.Ed. 1347.

In this case, plaintiffs in error to the Circuit Court of Appeals, 9th Circuit, were charged by indictments in the District Court with conspiracy to violate the Neutrality Act.

The case was presented upon an agreed statement of facts and the trial court literally instructed the jury to return a verdict of guilty against the defendants. The Circuit Court reversed the judgment of the lower court and remanded the case for a new trial. From the opinion I quote:

"It will be readily seen, not only from the stipulation itself, but from the foregoing declaration contained in the bill of exceptions, that there was no agreement between the parties in regard to any inference or deduction to be drawn from the actual facts agreed on. Obviously, all such inferences and deductions were left to be drawn, and only could be properly drawn, by the jury upon submission of the case to them, after opportunity of argument by the counsel of the respective parties. It might have been, and doubtless would have been, argued to the jury, as it is argued here to this court, that the agreed statement of facts wholly fails to show that the present plaintiffs in error, or, indeed, any of the defendants to the indictment, ever within the territory of the United States, conspired to 'hire or retain,' or ever did 'hire or retain,' any of the persons named in the indictment, or any other person or persons, to go beyond the limits and jurisdiction of the United States with the intent or purpose specified in the indictment. The defendants thereto might well have contended before the jury, as the plaintiffs in error do here, that what they did, as shown by the agreed statement of facts, was in effect to aid and assist the persons referred to in the indictment and in the agreed statement of facts to go beyond the limits of the United States with the intent and for the purpose charged, and was in no respect the hiring and retaining them prohibited by the statute."

There is certainly nothing in either of the cases which causes me to change my opinion as to the possibility of a conviction of the applicant in the case now before this Court if he had been tried following his arrest at Detroit. I think the prosecuting attorneys, including, as the record in this case shows, the Attorney General of the United States, were aware of the situation and of the evidence which could be adduced. After about ten days following the arrest, applicant was released and, as shown by the record, the case was never

thereafter called to trial and, as pointed out in the majority opinion, was dismissed.

After diligent search, I have been unable to find anything which convinces me that the applicant, Mr. Schware, could have been convicted if there had been a trial following his arrest. The record before us does not show that anything was paid by the applicant to anybody else or that the applicant made any promise of anything to any other person by way of compensation or reward to be paid in the future. Somebody advanced some money to the four men who wanted to go overseas while they were in New York, but that certainly was not Schware. When it was found that the four men could not stow away and reach Spain, and that only three could go, the one who must return home was selected by tossing coins and the applicant was the one who must return home. Somebody gave them the money to pay for his transportation and he returned.

The record shows nothing in the indictment as to its contents. The record names no individual who was hired or retained or engaged, or whom the applicant sought to hire or retain or engage. It is not shown by the record before us that applicant ever succeeded in causing anybody to enlist or enter himself in the United States, in the service of a foreign country.

Evidently, the four who reached New York were acting in concert, one as anxious to get over to Spain as the other.

I have previously read the letters set out in the latest majority opinion and find nothing to change my mind as to this case. Both letters, set out in part in the latest majority opinion, were written in 1944, at a time when the applicant was a soldier in the service of his country. Each of these letters speaks of that which occurred in or prior to the year 1940.

In the majority opinion it is again asserted that neither the author nor any of the justices concurring have at any time examined the file of what is called "Confidential Information." It is also again declared that the Board of Bar Examiners has stated that the recommendation to the court was not based on confidential information, but upon facts disclosed by petitioner himself. In the majority opinion this is found with reference to the confidential information: "Petitioner is now merely seeking to read some prejudice to himself into the proceedings where there is none in fact." It must be assumed, I think, that the Board of Bar Examiners, having notified the applicant that he could take the examination on a certain day, undertook for some reason upon his appearance on that date for the purpose of examination, to call him before the Board and interrogate him. Just what the interrogation was about at that time and to what extent it went and just what answers Mr. Schware made does not appear. What

was that reason? Could it have been on account of the substance of that which is called "Confidential Information"? The application of Mr. Schware had been in the hands of the Clerk of the Board for a considerable length of time. There must have been some reason for Mr. Schware's interrogation at that time and his being denied the right to then take the examination. As I understand this situation, applicant is now denied the right to take the bar examination because of the hearing in Albuquerque.

That matter has been sufficiently discussed, I think. I am now strengthened in my belief that it is not only the right but the duty of the members of this court to know everything, including the "Confidential Information" placed before the Board of Bar Examiners.

I quote from the majority opinion overruling applicant's motion for rehearing:

"No answer can now be made to petitioner's request he be advised as to whether he will be permitted to take the bar examination at some future date. The answer to such a request will depend upon the showing then made and how it may be viewed by the Court."

To me this statement is indeed strange. Bearing in mind that since 1940 the applicant has lived a life with which no fault has been found and as far as the record shows, no fault can be found; remembering also that during this fifteen year period applicant has served a period of three years in the U. S. Army, being there required if need be to lay down his life for those of us who are either too old or too infirm to go into the armed services in defense of our country and that he so served that he received an honorable discharge; and remembering that thereafter he proceeded from his high school accomplishments to acquire such education as qualified him to take the Bar Examination in our state except for a character showing, I inquire if fifteen years of blameless life is not long enough to establish his good character, how long will it take?

Remembering the applicant is now forty-one years of age and desires to enter, at that late time, upon the practice of law, if another fifteen years of life with no wrong doing shall pass, will applicant then be of such character as to enable him to take the bar examination? Assuming the applicant will in the future live a blameless life there can be no record before the Board of Bar Examiners at any future date which will differ in any material respect from that placed before the Board and this court.

It will always be a fact that in his youth and to 1940 applicant was affiliated with the then Communist party at a time when membership in that party cast no stigma on any individual.

. It will always be a fact that applicant, on several occasions, before his father's death made use of an alias.

It will always appear that the applicant, in his youth, was arrested several times but never tried or convicted for any offense.

Under the majority holding, there can be no change of circumstances justifying permission to applicant to take the bar examination at any time in the future if he continues to live a life without misconduct.

The view taken of the present situation by the majority should lead to answering the applicant's question as to whether he will ever be allowed to take the Bar Examination plainly and positively—No. No other logical result can ever follow the order of the majority than the refusal of an examination to the applicant any and every time he may apply. Should Mr. Schware apply to take the bar examination in any other state or states he would have to disclose this fact.

I deeply regret that the Communist party was ever organized in the United States of America, but I would not condemn and leave helpless those who forsook the error of their ways and have for many years lived the kind of life lived by other people who are considered worthy citizens.

For the reasons expressed, I dissent.